UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------

                               :

LYMAN COMMERCE SOLUTIONS, INC.,    :

               Plaintiff,    :         12 Civ. 4398 (TPG)

                               :

          v.           :         ECF CASE

                               :

CONRAD LUNG, RICHARD GILBERT, *et al.*, :       **OPINION**

                               :

               Defendants.    :

                               :

------------------------------------------

      This is a suit brought by plaintiff Lyman Commerce Solutions, Inc. against defendants

Conrad Lung, Lung's Consultants, LLC, Richard Gilbert, and additional related entities.

Plaintiff provides online commerce technology, marketing and design services.  Defendants were

previously involved in a company called MUDD.  MUDD—a now-defunct company, previously

incorporated in Delaware and headquartered in New York—filed for dissolution in August of

2008.  (Pls. SOF ¶ 1.)[1]

      Plaintiff seeks to recover payments from MUDD to defendants Richard Gilbert, R.D.

Simpson, Inc., the Richard Gilbert Family Trust, and Irwin Levy as Trustee of the Richard

Gilbert Family Trust (collectively, "the Gilbert defendants").  Plaintiff also seeks to recover

payments from MUDD to Lung's Consultants, LLC—a company owned by Conrad Lung, the

---

[1] Plaintiff's Rule 56.1 Statement of Facts is referred to as "Pls. SOF."  The Gilbert defendants' Rule 56.1 Statement of Facts is referred to as "Gilbert SOF."  The Lung defendants' Rule 56.1 Statement of Facts is referred to as "Lung SOF."

former president of MUDD (collectively, "the Lung defendants"). Plaintiff claims that these payments were fraudulent conveyances under the New York Debtor and Creditor Law ("DCL").

Although the Complaint includes five counts, plaintiff moves for summary judgment on Count One only. Count One involves four allegedly fraudulent conveyances identified in the complaint whereby defendants sold back their "membership interests" in MUDD pursuant to a "redemption agreement." These four conveyances total approximately $3.1 million, and were made after plaintiff filed suit in an Iowa court against MUDD—a suit that resulted in a still-unsatisfied final judgment against MUDD.

Plaintiff contends that the Gilbert and Lung defendants are corporate insiders, and thus transfers from MUDD to these defendants constitute *per se* fraudulent conveyances under DCL § 273-a ("§ 273-a"). Additionally, plaintiff claims that the "redemption" of membership units by MUDD was simply a mechanism for transferring MUDD's capital to its members, and that there was no "equivalent value" received by MUDD in exchange. Plaintiff thus claims that, as a matter of law, these transfers lack "fair consideration," and constitute constructive fraudulent conveyance under § 273–a. And, because summary judgment with respect to these four conveyances would sufficiently satisfy the outstanding judgment against MUDD from the Iowa proceeding, plaintiff claims that a grant of summary judgment on the conveyances outlined in Count One would moot the remainder of the allegations in the complaint.

For the reasons set forth below, plaintiff's motion for partial summary judgment is granted.

2

## **BACKGROUND**

The following facts are not in dispute unless otherwise stated.

A. <u>The Gilbert Defendants</u>

From 2004 until August 2007, Richard Gilbert was the CEO of MUDD and a manager on MUDD's board of managers. (Gilbert SOF ¶ 3.)  Gilbert formed Mudd, LLC in 1996.  In May 2004, he sold his interest in MUDD to TFM Holdings Corporation ("TFM").  As part of that sale, all of the assets of Mudd, LLC were transferred to a new entity—MUDD USA LLC ("MUDD")—in which Gilbert received minority interests.  Gilbert entered into an employment agreement to act as MUDD's CEO for three years, with an option for one-year extensions after the expiration of the initial three-year term.  (Gilbert Declaration at Ex. C; Pls. SOF ¶ 3).

Pursuant to the terms of an Operating Agreement entered into by the members of MUDD in May 2004, Gilbert was granted a "put right" for his minority interests if his employment was not extended.  (Gilbert Decl. at Ex. B.)  Gilbert claims to have exercised this "put option" in July 2007, after MUDD had "sold virtually all of its business" and had informed Gilbert he would be terminated.  (Dkt. No. 69 at 5-6; Gilbert Decl. at Ex. E.)  He was ultimately paid $1.87 million upon the execution of a "Settlement and Redemption Agreement," executed in mid-August 2007 but "effective" as of March 31, 2007.  (Gilbert Decl. at Ex. F; Gilbert SOF ¶ 16.)  Before exercising the Settlement and Redemption Agreement, Gilbert owned approximately 2,000 "membership units" in MUDD.  (Pls. SOF ¶ 13.)

The Gilbert Family Trust, also a named defendant, was managed by defendant Trustee Irwin Levy, and was also a member of MUDD from 2004 until August 2007.  (Hugel Decl. at Ex. J; Gilbert SOF ¶ 7.)  Before August 2007, the Gilbert Family Trust owned 500 membership

units in MUDD. (Pls. SOF ¶ 15.) The Gilbert Family Trust was created for the benefit of Gilbert's family. (Gilbert SOF ¶ 8.)

R.D. Simpson, also a named defendant, was a member of MUDD from 2004 through August 2007. (Gilbert SOF ¶ 4.) Between May 2004 and August 2007, Gilbert was the President of R.D. Simpson and its sole legal and beneficial owner. (Gilbert SOF ¶ 5.) Before August 2007, R.D. Simpson owned 10,490 membership units of MUDD.

### B. The Lung Defendants

Between 2004 and 2007, Conrad Lung was Vice President and later President of MUDD, and a manager on its board of managers. (Hugel Decl. at Exs. F, I and K; Lung SOF ¶¶ 9-10.) Lung was listed as one of the "control persons" on MUDD's brokerage account with Neuberger Berman. Lung does not dispute his listing as a control person, but claims this was so because the true control persons were not U.S. citizens. He claims he did not in fact have any independent authority to act without the approval of the majority owners of MUDD. (Lung SOF ¶ 48.) Nevertheless, Lung executed the relevant Settlement and Redemption Agreement on behalf of MUDD, its then-majority owner TFM, and other related entities. (Gilbert Decl. at Ex. F; Pls. SOF ¶¶ 16-17.) The Settlement and Redemption Agreement was also executed by Wing Kwok, Chairman of MUDD's Board of Managers.

Lung is also the co-owner—along with his family members—of Lung's Consultants LLC, a named defendant that received a $1.2 million transfer at issue. (Lung SOF ¶ 11.) Plaintiff claims that Lung's Consultants indirectly owned a 5% interest in MUDD. (Pls. SOF ¶ 19.) Lung denies this, but admits that a separate company called Lung Investment Holdings ("LIH")—in which Lung held an ownership stake—did indirectly own an interest in MUDD. (Lung SOF ¶ 19.) Lung claims that he did not "personally exercise control" over Lung's

4

Consultants LLC, because his wife and daughter are also signatories on its bank account. (Lung SOF ¶ 12.) Plaintiff counters that Lung was the sole managing partner of Lung's Consultants.

C. The Underlying Litigation

Plaintiff once provided online commerce services to MUDD on a contractual basis. In early 2006, MUDD defaulted on its payment obligations under a contract it had with plaintiff. After unsuccessful settlement negotiations between the parties, on February 19, 2007, plaintiff filed suit against MUDD in Iowa state court, seeking money damages for breach of contract. (Levy Decl. at Ex. D; Hugel Decl. at Ex. B; Pls. SOF ¶ 20; Gilbert SOF ¶ 20.) MUDD filed its answer in August 2007.

After its attorney withdrew from the Iowa case in December 2008, MUDD did not appear for trial. (Gilbert SOF ¶ 21.) The Iowa lawsuit resulted in a judgment entered against MUDD in the amount of $2,176,049.01 on March 17, 2009. (Hugel Decl. at Ex. D; Gilbert SOF ¶ 29.) Plaintiff then brought an action against MUDD in New York seeking to enforce the Iowa judgment, which resulted in full recognition of the judgment by a New York State court on February 24, 2010. (Hugel Decl. at Ex. E; Gilbert SOF ¶ 30.) No part of this judgment against MUDD has been satisfied. (Hugel Decl. at Ex. L; Gilbert SOF ¶ 31.)

D. The Transfers At Issue

In 2006 and 2007, MUDD sold virtually all of its assets, receiving approximately $90 million in cash and stock from a publically traded company called Iconix. MUDD ceased most business operations by January 2007. (Pls. SOF ¶ 2.) After an initial winding-up period, by August 2007—when it filed its answer to plaintiff's complaint in Iowa state court—MUDD retained more than $14 million in assets. (Hugel Reply Decl. at Exs. D, E.) This sum included a $1 million litigation reserve set aside for plaintiff's pending complaint in Iowa. (Levy Decl. at

5

¶ 21-22.) By mid-September 2007, however, MUDD's assets had been reduced to approximately $300,000. This reduction in MUDD's assets was due in part to transfers by the majority owner of MUDD in August or September 2007 to third parties "TFM" and "Global Far East"—none of whom are defendants in this action. The Gilbert defendants admit that "no legal basis . . . has ever been offered" for such transfers. (Dkt. No. 69 at 16.)

The drastic reduction in MUDD's assets was also due in part to the four payments at issue to the Gilbert and Lung defendants, which were all made by MUDD on August 24, 2007. The four transfers are: (1) $1.2 million conveyed to Lung's Consultants; (2) approximately $1.8 million conveyed to R.D. Simpson, Inc. (a company controlled by Richard Gilbert); (3) $85,000 conveyed to the Richard Gilbert Family Trust; and (4) $1,700 conveyed to Richard Gilbert. These transfers were made when MUDD was no longer engaged in any major business operations. Each of these transfers was made from MUDD's New York brokerage accounts to accounts in New York held by the Gilbert and Lung defendants. Defendants do not dispute the date or amount of these transfers, except to note that the payments were technically made from MUDD to an escrow agent, who forwarded the funds to the relevant defendants. Lung also does not dispute that MUDD received no property in exchange for the $1.2 million paid to Lung's Consultants. (Lung Decl. at 19.)

According to plaintiff, these transfers came two days after "Gilbert and Lung, in their capacity as members of Mudd's Board of Managers, executed a resolution directing Mudd to buy the Mudd membership units owned by Gilbert, R.D. Simpson and The Richard Gilbert Trust[.]" (Pls. SOF ¶ 16.) The Lung defendants do not dispute this. The Gilbert defendants dispute plaintiff's description of the resolution and the subsequently entered Settlement and Redemption Agreement, stating: "The Unanimous Written Consent of the Board of Managers, dated August

6

22, 2007, authorized Mudd to enter into the Settlement and Redemption Agreement, which redeemed the minority members' interest in Mudd for $3.4 million and settled outstanding claims." (Gilbert SOF ¶ 16.)  The Gilbert defendants claim that this agreement obligated MUDD "to redeem all of the Class B units pursuant to the put option, which Mudd's Operating Agreement had provided for since 2004."  (*Id.*; *see also* ¶¶ 32-36.)

### E.  Procedural History

On September 7, 2012, the Gilbert defendants and the Lung defendants moved to dismiss the complaint.  (Dkt. Nos. 21, 25.)  Plaintiff responded both by opposing the motion to dismiss, (Dkt. No. 31), and by filing the instant motion for partial summary judgment on Count One. (Dkt. No. 28.)

The court denied defendants' motions to dismiss on August 30, 2013, (Dkt. No. 52), but did not rule on plaintiff's motion for partial summary judgment.  The court later rejected the Gilbert defendants' motion for the court's reconsideration of its denial of the motion to dismiss, and affirmed that New York law—not Iowa law—applies here.  (Dkt. No. 87.)  Plaintiff's motion for partial summary judgment remained pending, and is the subject of this opinion.

### **APPLICABLE LEGAL STANDARD**

Summary judgment may be granted if, on the entire record, there is no genuine issue as to any material fact, such that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to such a fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*  The non-moving party may not manufacture a dispute through "conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), and "'may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Priestley v. Panmedix Inc.*, 18 F. Supp. 3d 486, 495 (S.D.N.Y. 2014) (quoting *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir. 2010)).  But the evidence should be construed in the light most favorable to the non-moving party, and reasonable inferences should be drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

## DISCUSSION

In support of its motion, plaintiff notes that MUDD wired approximately $1.8 million to the Gilbert defendants and $1.2 million to the Lung defendants while the Iowa court proceeding was pending.  Plaintiff argues that such payments lacked "good faith" as required by the DCL, because transfers made by a company to its insiders lack good faith *per se* under New York law. (Dkt. No. 31 at 32.)  Thus, plaintiff contends that, regardless of whether the redemption payments made by MUDD to the Gilbert and Lung defendants rendered MUDD insolvent at the time the moneys were transferred, the conveyances lacked good faith consideration.

Plaintiff also argues that what MUDD received in exchange for this $3.1 million – the defendants' membership interests – had no value to MUDD or to its creditors.  Plaintiff thus claims that "Mudd's redemption of the defendants' membership units depleted Mudd's assets and gave Mudd nothing of economic value in return." (Dkt. No. 31 at 35.)  As such, the conveyance benefited MUDD's insiders but diminished its ability to pay other creditors.  In sum, plaintiff argues that "[w]hether due to the absence of good faith, the absence of equivalent value, or both, the Redemption Payments made by Mudd of $1,8700,000 to the Gilbert Defendants and $1,200,000 to the Lund [sic] Defendants lacked [good] 'faith consideration,'" and thus violate § 273-a. (Dkt. No. 31 at 35.)

8

### A. The Timeliness of Plaintiff's Claims

#### i. **Statutes of Limitation and Repose**

As an initial matter, all defendants argue that plaintiff's claims are barred as untimely. Defendants cite to Sections 508(c) of New York's Limited Liability Company Law, which provides for a 3-year statutory limit on claims against members of limited liability companies who have received wrongful "distributions." N.Y. LLC Law § 508. Defendants argue that plaintiff's claims are untimely, because the relevant "distributions" from MUDD occurred in August 2007, but plaintiff did not bring this suit until June 2012.

Alternately, defendants claim that, as a Delaware LLC, MUDD was subject to the statute of repose specified in the Delaware Code. Like N.Y. LLC Law § 508, the relevant Delaware statute of repose bars claims brought more than three years after "distributions" made by a LLC to its members. *See* Delaware Limited Liability Act § 18-607(c).

Defendants' claims are flawed. First, defendants attempt to characterize the transfers at issue as "distributions" by MUDD to its members. But in contrast to the Gilbert defendants— who claim that Gilbert was a "member" of MUDD and that transfers to him were "distributions" from MUDD satisfying a preexisting put option—Lung's Consultants admits that it had no membership interest in MUDD. (Lung SOF ¶ 25.) Section 508(c) thus cannot apply to the transfer to the Lung defendants.

Second, even if the Gilbert defendants may be "members" of MUDD as defined in Section 508, the court does not accept the argument that the three-year limitations period in Section 508 is meant to displace the six-year period specified in the CPLR for fraudulent conveyance claims of outside creditors. Section 508, by its terms, applies to amounts owed by a

member to "the limited liability company"—*not* to outside creditors.[2]  To hold that outside
creditors are subject to Section 508's limitations period when bringing claims for fraudulent
conveyances to corporate members would be to hold that fraudulent transfers to a corporate
insider could be challenged for only half as long as transfers to persons outside the corporate
entity.  Such a holding would turn the purposes of the fraudulent conveyance statute on its head,
which—as discussed in more detail below—applies most stringently against transfers to
corporate insiders.

Nor does Section 18-607(c) of the Delaware Limited Liability Act bar the instant claims.
The court has already ruled that New York law—not Iowa or Delaware law—applies to
plaintiff's claims.  (*See* Dkt. No. 52 at 9.)  Moreover, the court notes that Section 18-607(c),
which is nearly identical to New York's Section 508, "creates a *corporate* cause of action against
LLC members who improperly receive a distribution of those assets," but does not specifically
apply to actions brought by outside creditors. *See Pepsi-Cola Bot. Co. of Salisbury, Md. v.
Handy*, No. 1973-S, 2000 WL 364199, at *5 (Del. Ch. Mar. 15, 2000) (emphasis added).
Finally, the Settlement and Redemption Agreement entered into by the Gilbert defendants
includes a specific clause that the agreement would be governed by New York law.  (Gilbert
Decl., Ex. F at 7.)

---

[2] To the extent certain opinions cited by defendants apply the limitations period specified in Section 508(c), the
court notes that the plaintiffs in those cases were bankruptcy trustees—not outside creditors—seeking to recover
improper distributions made by a LLC to its members. *See Williamson v. Culbro Corp. Pension Fund*, 41 A.D.3d
229 (1st Dep't 2007); *In re Die Fliedermaus LLC*, 323 B.R. 101, 106-07 (Bankr. S.D.N.Y. 2005).  It appears that
two New York trial court opinions read such cases to apply Section 508(c)'s three-year limitations period on
fraudulent conveyance claims by outside creditors. *See Mostel v. Petrycki*, 25 Misc. 3d 929, 932, 885 N.Y.S.2d 397,
399 (Sup. Ct. 2009); *Peckar & Abramson, P.C. v. Lyford Holdings, Ltd.*, 1009 NY Slip Op 33023(U) (Sup. Ct. N.Y.
Co. 2009).  Such cases are not binding on this court, and the court declines to apply their reasoning here.

The court holds that the applicable statute of limitations in this case is six years, based on the CPLR provision which typically applies to fraudulent conveyance claims under the DCL. *See* CPLR § 213.  Because plaintiff filed suit within the six-year period, the instant claim is timely.

ii.   **Claims for Additional Discovery**

In addition to their arguments that the motion is barred by the statute of limitations, all defendants also argue that the motion is premature because they are entitled to certain additional discovery.  But the court finds that the motion is not premature.

Federal Rule of Civil Procedure 56(d) states: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d). Citing to this rule, defendants claim that they need time to conduct certain discovery to properly oppose the motion.  Specifically, the Gilbert defendants seek discovery regarding the solvency of MUDD before and after the transfers in question, as well as discovery regarding the value of the shares in MUDD previously owned by the Gilbert defendants.  The Lung defendants also claim that additional discovery is warranted before reaching the merits of plaintiff's motion, and specifically seek information regarding "whether the Iowa Default Judgment was obtained by fraud, and further whether plaintiff actually suffered the damages reflected in the Iowa Default Judgment."  (Dkt. No. 78 at 34.)

As made clear below, the court finds that the question of MUDD's solvency or the value of MUDD shares previously owned by the Gilbert defendants is ultimately irrelevant for purposes of defendants' liability under § 273-a.  Additional discovery regarding these issues is

11

therefore unnecessary to address plaintiff's motion for summary judgment. Nor is the discovery

sought by the Lung defendants—which essentially seeks to re-litigate the merits of a final

judgment in Iowa already given full faith and credit by a New York court—necessary to reach

the merits here. The court thus finds that the motion is timely and not premature. *See Burlington

Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923 (2d Cir. 1985) ("disputes

over irrelevant facts must not be allowed to obscure the lack of a material dispute[.]") (internal

citations omitted).

### B.   § 273-a

As the court finds that the motion is timely, the court turns to the primary question at

issue: whether the four transfers from MUDD to the Gilbert and Lung defendants were

fraudulent under § 273-a.

§ 273-a provides: "Every conveyance made without fair consideration when the person

making it is a defendant in an action for money damages or a judgment in such an action has

been docketed against him, is fraudulent as to the plaintiff in that action without regard to the

actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to

satisfy the judgment." N.Y. DCL § 273-a (McKinney 2002). Thus, to prevail on a claim under

§ 273-a, a plaintiff must establish that: (1) the conveyance was made without fair consideration;

(2) at the time of transfer, the transferor was a defendant in an action for money damages or a

judgment in such action had been docketed against him; and (3) a final judgment has been

rendered against the transferor that remains unsatisfied. *Priestley*, 18 F. Supp. 3d at 497; *Grace

v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 188 (2d Cir. 2006). The defendant's intent is

irrelevant. The purpose of § 273-a is "to provide a remedy for a creditor who has brought an

action for money damages against a party who, after being named a defendant in that action,

conveys assets to a third party for less than fair consideration leaving the ultimate judgment unpaid." *Cadle Co.*, 2002 WL 1888716, at *8 (internal citations omitted). In evaluating a transaction for alleged fraudulent conveyance, the transaction must be examined in its full context; "where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." *Priestley*, 18 F. Supp. 3d at 499.

By contrast, § 273 provides: "Every confidence made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. DCL § 273 (McKinney 2001).[3] Sections 273 and 273-a thus provide alternate theories of fraud: § 273 "applies to transfers that render a debtor insolvent, and the existence of an action or judgment is irrelevant," while § 273-a "applies where there is an action pending or a judgment already docketed, but *there is no requirement that the transfer rendered the debtor insolvent*." *Cadle Co. v. Newhouse*, No. 01 CIV. 1777 (DC), 2002 WL 1888716, at *5-6 (S.D.N.Y. Aug. 16, 2002), *aff'd*, 74 F. App'x 152 (2d Cir. 2003) (emphasis added). In effect, § 273-a "substitutes the requirement of an unpaid judgment (or a pending action) for the requirement of insolvency." *Mitchell v. Lyons Prof'l Servs., Inc.*, No. 09 CIV. 1587 BMC, 2013 WL 4710431, at *3 (E.D.N.Y. Sept. 1, 2013) *vacated and remanded on other grounds, Mitchell v. Garrison Protective Servs., Inc.*, 579 F. App'x 18 (2d Cir. 2014); *see also Dixie Yarns, Inc. v. Forman*, 906 F. Supp. 929, 938 (S.D.N.Y. 1995) ("a claimant under § 273-a need not demonstrate the insolvency of the judgment debtor. It is sufficient to support the claim that the

---

[3] The DCL states that "a person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. DCL § 271 (McKinney 2001).

judgment has not been satisfied; and if, as here, it has not, the question of insolvency is irrelevant to the considerations at hand.") (internal citations omitted).

Defendants emphasize that MUDD was not necessarily insolvent in August 2007 when the transfer as issue were made, and thus plaintiff's motion should be denied. This argument might carry weight if plaintiff was pursuing its claim under DCL § 273. But plaintiff is suing under DCL § 273-a, and as noted above, the weight of authority states that § 273-a does not require proof of insolvency at the time the judgment debtor made an allegedly fraudulent transfer.[4]

Here, there is no dispute that two of three requirements for liability under § 273-a are met. Plaintiff obtained a money judgment in its action against defendants, and defendants have thus far failed to satisfy the judgment. Accordingly, plaintiff's claims under § 273-a hinge on whether MUDD received "fair consideration" in return for the payments made to the Gilbert and Lung defendants in August 2007. To address the issue of fair consideration, the court must turn to DCL § 272.

     C. <u>Section 272</u>

N.Y. Debt. & Cred. Law § 272 defines "fair consideration" for purposes of § 273-a. It provides that:

---

[4] A bankruptcy case relied upon by defendants in pleading that insolvency is required rules that way in the context of a claim under Section 544(b) of the Bankruptcy Code, not § 273-a—and also notes that New York law "allows insolvency to be presumed if the transfer was made without fair consideration." *In re Trinsum Grp., Inc.*, 460 B.R. 379, 391-93 (Bankr. S.D.N.Y. 2011). And while a second case, *Wechsler v. Hunt Health Sys., Ltd.*, No. 94 CIV. 8294 (PKL), 1999 WL 397751, at *21-23 (S.D.N.Y. June 16, 1999) does hold that an issue of fact regarding solvency can preclude summary judgment, it so ruled on a claim under § 273, not § 273-a.

Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation, is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

N.Y. DCL § 272 (McKinney 2002).  In interpreting this statute, the Second Circuit has stated that the "fair consideration test is profitably analyzed as follows: (1) the recipient of the debtor's property must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange must be a 'fair equivalent' of the property received; and (3) such exchange must be 'in good faith.'" *Priestley*, 18 F. Supp. 3d at 498 (quoting *In re Sharp*, 403 F.3d at 53 (2d Cir. 2005) (internal citations omitted)); *see also Sardis v. Frankel*, 113 A.D.3d 135, 141-42 (2014) ("'Fair consideration' under Debtor and Creditor Law § 272 is not only a matter of whether the amount given for the transferred property was a 'fair equivalent' or 'not disproportionately small,' . . . but whether the transaction is made 'in good faith,' an obligation that is imposed on both the transferor and the transferee."); *United States v. McCombs*, 30 F.3d 310, 326 n. 1 (2d Cir. 1994) ("'Fair consideration' requires not merely that the value of the consideration be roughly equivalent to the property in issue but also that there be good faith on the part of the parties involved in that conveyance.").

The general rule is that the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property, and that 'at least where no actual intent to hinder, delay, or defraud creditors has been shown ... even the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance.'" *Priestley*, 18 F. Supp. 3d at 501 (quoting *Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 85-86 (2d Cir. 1996)).  However,

New York courts have recognized an exception to this rule where the transferee is an officer, director, or major shareholder of the transferor. *Id.*; *see also Sharp Int'l Corp. v. State St. Bank & Trust Co.,* 403 F.3d 43, 54 (2d Cir. 2005); *Farm Stores, Inc. v. Sch. Feeding Corp.*, 102 A.D.2d 249 (2d Dep't 1984). When preferences are given to a debtor corporation's shareholders, officers, or directors, such transfers are generally deemed not to be for fair consideration and *per se* violations of the good faith requirement. *Id.* (citing *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 634 (2d Cir. 1995)).

This court has previously interpreted the bad faith presumption to apply not to *all* preferential transfers to insiders, but rather only to such transfers discharging antecedent debts that do not offer any present value to the corporation (which could then be used to satisfy demands of judgment creditors). *See Bank of Commc'ns v. Ocean Dev. Am., Inc.*, 904 F. Supp. 2d. 356, 361 (S.D.N.Y. 2012) (holding that a transaction with corporate insiders was not *per se* lacking in good faith at summary judgment because the corporation received over half a million dollars in value for the transaction at issue, which it promptly distributed to creditors); *see also Interpool Ltd. v. Patterson*, 890 F. Supp. 259, 266-68 (S.D.N.Y. 1995) (the "existence of a fair exchange must be determined from the perspective of creditors rather than from the vantage point of the debtor . . . in determining whether a conveyance is fraudulent, the touchstone is the unjust diminution of the estate of the debtor that otherwise would be available to the creditors.").

D. Defendants' Liability Under § 273-a

With the above case law in mind, the court has reviewed—among other materials—the Rule 56.1 statements from all sides, the Hugel Declaration, the Stern Declaration, the Levy Declaration, the Elman Declaration, the Lung Declaration, the Gilbert Declaration, and all of the

16

attached exhibits. This record indicates that there is no genuine dispute about the fact that the transfers at issue to the Gilbert and Lung defendants were fraudulent conveyances under § 273-a.

## 1. The Gilbert Defendants

The Gilbert defendants do not seriously deny that that they were corporate insiders, or that a final judgment against them remains pending and unsatisfied. However, they argue that the New York rule finding that conveyances to corporate insiders *per se* lack fair consideration applies only to transfers made by companies that are insolvent at the time of payment. According to the Gilbert defendants, at the time MUDD made the conveyances in question, MUDD was in fact solvent, with a surplus of $14 million. (Dkt. No. 75-1; Levy Decl. at Exs. E-G; Gilbert Decl. at ¶ 21.) The Gilbert defendants claim that MUDD was rendered insolvent only several days *after* the transfers to the Gilbert defendants, based on additional transfers of millions of dollars to third parties by the majority owner of MUDD. The Gilbert defendants admit that "no legal basis . . . has ever been offered" for these payments to other third parties. (Dkt. No. 69 at 16.) But they claim that on these facts, the Gilbert defendants acted in good faith, and cannot be held liable for the subsequent bad conduct of MUDD's majority owner rendering it insolvent.

As noted above, however, insolvency of the transferor company is *not* required for liability under § 273-a generally, or for the specific application of the *per se* rule that transfers to insiders lack fair consideration. *See Cadle Co.*, 2002 WL 1888716, at *5-6 ("[T]here is no requirement that the transfer rendered the debtor insolvent"). Having conceded that they are in fact corporate insiders, the Gilbert defendants cannot escape the *per se* rule, which deems the transaction to both lack fair consideration and good faith.

Nevertheless, the Gilbert defendants argue that the payments to them were in fact made for fair consideration. They contend that, under the terms of Gilbert's 2004 employment

17

agreement and the later Settlement and Redemption Agreement, Gilbert had a contractual right to "put" his interests in July 2007 at a fair market value. And, because the "put was option was a contractual right, the Gilbert defendants could have sued Mudd for specific performance of the put, and could have compelled Mudd to buy their interests. This means that the payments to Mudd extinguished potential common-law claims." (Dkt. No. 69 at 23.)

The court cannot accept the Gilbert defendants' argument that MUDD received fair consideration in exchange for its redemption of the relevant membership units. Gilbert admitted at his deposition that he "essentially cashed out [his] interest in Mudd," and could not recall any negotiations or discussions "about what [his] interest was worth." (Hugel Decl. at Ex. M, 38:11-21.) Whether a disputed fact exists regarding an underlying "put" agreement between Gilbert and MUDD, or a potential common-law claim by Gilbert that was extinguished as a result of his "cash[ing] out," is ultimately beside the point—and not enough to preclude a grant of summary judgment on this record. This is particularly so because, as noted above, the *per se* rule in fact applies here. Moreover, MUDD's "redemption" of Gilbert's membership units did not cancel some antecedent debt owed by MUDD, or provide MUDD with additional property that could be of value to pay outside creditors. Rather, MUDD's payment to Gilbert in exchange for "membership units" in a rapidly dissolving company simply diminished the assets available to MUDD, in derogation of the rights of its outside creditors. From the perspective of the creditor—which is the perspective that matters for purposes of liability under the DCL, *see Interpool Ltd.*, 890 F. Supp. at 266-68—there is simply no disputed fact on the record indicating that this type of exchange was for fair consideration or in good faith.

18

## 2.  The Lung Defendants

The Lung defendants make similar arguments to those made by the Gilbert defendants,
claiming that they had no control over MUDD's post-redemption actions, that they were not
notified by MUDD before the redemptions of its post-redemption plans, and that they did not
benefit from MUDD's post-redemption conveyances to third parties.  The Lung defendants
argue that while Conrad Lung individually was an officer of MUDD, he was not a stockholder or
transferee of MUDD's redemption—and thus was not a corporate insider.  Alternately, they
claim that while Lung individually may have been an "insider" of MUDD for purposes of the
DCL, Lung's Consultants was not an "insider."  The Lung defendants also claim that Lung did
not have sole control over Lung's Consultants, and that plaintiff has not proven that Lung should
be held liable as an "alter ego" of Lung's Consultants.

Additionally, the Lung defendants argue that Lung's Consultants was not a beneficiary or
"transferee" of the $1.2 million transfer from MUDD at issue.  Analogizing to bankruptcy law,
Lung's Consultants argues that it was not the intended transferee of that conveyance, but "merely
an intermediary (through which monies fleetingly passed) for MUDD's redemption of a third
party's (Sino Legend Ltd's) interest in MUDD, as well as Sino Legend Ltd's redemption of Lung
Investment Holding LLC's ("LIH") interest in Sino—because neither Sino, nor LIH had a bank
or brokerage account in the United States to receive such monies."  (Aug. 12, 2014 Ltr. From
Daniel I. Goldberg; Lung Decl. at ¶ 25; Lung SOF ¶¶ 26-27.)  And, to the extent the Lung
defendants in fact did benefit from the $1.2 million payment, they claim that there is a question
of fact as to whether fair consideration was given to MUDD in exchange for the payment.  (Lung
Decl. at ¶ 2.)  The Lung defendants also emphasize that the price of the "redemption" of Sino's

19

interest in MUDD was negotiated at arms-length, and thus there is also a question of fact as to whether the transaction was done in good faith.

The Lung defendants' arguments are without merit. First, the fact that Lung was an officer of MUDD—which he does not dispute—is enough to qualify him for the *per se* rule. *See Sharp Int'l Corp.,* 403 F.3d at 54 ("preferences to a debtor corporation's shareholders, *officers,* or directors are deemed not to be transfers for fair consideration") (emphasis added). Indeed, Lung was not just any officer, but the President of the company.

It is true that Lung's Consultants, as opposed to Lung individually, was not an officer of MUDD. But the undisputed record shows that Lung maintained control over Lung's Consultants as its managing partner. (Hugel Reply Decl., Ex. B at 2.) The fact that Lung's wife and daughter were also authorized signatories on the bank account for Lung's Consultants does not allow Lung's Consultants to escape liability under § 273-a. If the law were otherwise, corporate insiders could avoid the *per se* rule merely by funneling transactions to third companies also controlled by such insiders alongside their family members. Such a ruling would defeat the purpose of § 273-a. As the *per se* rule applies, the court must reject the Lung defendants' claim that plaintiff fails to show evidence of lack of fair consideration or good faith. Lack of fair consideration and good faith is presumed under the *per se* rule.

Even if the *per se* rule did not apply here—and it does—there is also no disputed fact on the record supporting the Lung defendants' claim that MUDD received fair consideration for the transaction in question. According to Lung's own declaration, MUDD received no property in exchange for the $1.2 million paid to Lung's Consultants, but instead merely "agreed upon the redemption of LIH's interest in Sino for the sum of $1.2 million dollars." (Lung Decl. at ¶ 19.) As with MUDD's "redemption" of membership units held by the Gilbert defendants, the

20

payment sent by MUDD through Lung's Consultants—even if it "redeemed" membership units held by a third party—simply funneled money out the door without gaining new assets in exchange to pay off plaintiff or other outside creditors.

The Lung defendants' claim that they were not the "transferee" of the $1.2 million as to which plaintiff is seeking summary judgment, but rather a mere conduit to pass funds from MUDD to third parties, is similarly unavailing. As another court in this district has rightly noted, "viewing the fairness of a transfer from the perspective of a creditor is consistent with the policy underlying statutes against fraudulent conveyances, which were enacted in order to protect the rights of creditors by preventing debtors from making transfers that would 'hinder, defraud or delay' creditors." *Interpool Ltd.*, 890 F. Supp. at 267. Here, the Lung defendants have done just that by rendering $1.2 million unreachable to plaintiff, an outside creditor. Looking at this transaction in its full context, and from the perspective of the creditor, the court does not credit the Lung defendants' explanation that liability to an outside creditor under § 273-a may be avoided by simply transferring funds down the line, from a company to a corporate insider to a third party. A subsequent transfer cannot be a defense when the initial conveyance is fraudulent under the DCL.[5]

---

[5] Plaintiff's alleged failure, at this juncture, to prove that Lung is the "alter ego" of Lung's Consultants does not mean that summary judgment is not warranted on Count One against the Lung defendants. It merely means that Lung may argue, if he so chooses, that the corporate veil of Lung's Consultants should not be pierced to hold Lung individually liable when a judgment for damages is finalized in this litigation.

21

**CONCLUSION**

When MUDD was first sued in the Iowa proceeding, it had over $14 million in various accounts.  Approximately six weeks later, MUDD held only $300,000—well below the amount required to satisfy the later imposed Iowa judgment.  This drastic depletion of MUDD's assets during the pendency of the Iowa action was due in large part to conveyances to insiders, including the Gilbert and Lung defendants.

The undisputed facts show that MUDD transferred over $3 million to the Gilbert and Lung defendants when MUDD was already the subject of the Iowa claim, and that MUDD did not receive equivalent value in return.  In voluminous filings, neither the Gilbert nor Lung defendants have managed to dispute these basic facts, except to highlight MUDD's supposed solvency for a short time after the transfers in question.  But as discussed above, solvency alone does not preclude liability under § 273-a.

The court thus finds that no genuine issue of material fact exists with respect to whether the conveyances at issue were made for fair consideration or, in the alternative, made in good faith.  The transactions in question—preferential repayments to corporate insiders, in derogation of the rights of plaintiff, a general creditor—were fraudulent conveyances under the DCL.  On this evidentiary record, plaintiff's motion for partial summary judgment is granted.

The court directs the parties to meet and confer, and to submit a joint letter to the court setting forth their views as to the remedies that the court should order consistent with this decision.  This letter must be filed within 30 days of the date of this opinion.

This opinion resolves the motion listed as item 28 on the docket.

SO ORDERED.

Dated:   New York, New York
         April 20, 2015

_____
Thomas P. Griesa
U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/20/15

23